**GSF ENERGY, LLC, Appellant,**

v.

**Herlinda PADRON, Individually and as Heir at Law of Adan Padron, Deceased, and as Next Friend of Adam Padron, Fernando Padron, Arturo Padron, and Hector Padron, Minors; and Tayna Padron, Appellees.**

No. 01–09–00622–CV.

Court of Appeals of Texas, Houston (1st Dist.).

June 2, 2011.

Thomas C. Wright, Wright & Close, LLP, Wanda McKee Fowler, Wright Brown & Close, LLP, Houston, TX, for Appellant.

Christian J. Ward, Marc Samuel Tabolsky, Yetter Coleman, L.L.P., Austin, TX, for Appellees.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION ON REHEARING

EVELYN V. KEYES, Justice.

Both appellant and appellees have filed motions for rehearing. Appellees have also filed a motion for en banc reconsideration. We grant rehearing, withdraw our previous opinion, deny appellant's and appellees' requested relief, and dismiss as moot the motion for en banc reconsideration.[1] Our judgment of February 10, 2011 remains unchanged.

1. *See Brookshire Bros., Inc. v. Smith,* 176 S.W.3d 30, 41 (Tex.App.-Houston [1st Dist.] 2004, pet. denied).

This appeal arises out of the death of Adan Padron, who was killed when debris fell on him while he was cleaning the inside of a processing-plant tank. Padron's wife and children sued the plant operator and Padron's employer for negligence and premises liability.[2] We must decide whether the plant operator exercised or retained control over the manner in which Padron's employer, an independent contractor, performed its work such that the plant operator can be liable for Padron's death. In addition, we must determine whether the trial court erred in submitting the jury charge. We reverse the trial court's judgment and remand the case for further proceedings.

## Background

Appellant GSF Energy, LLC operates a landfill-gas processing plant on McCarty Road in Houston. The plant gathered gas produced from wells drilled into a landfill owned by BFI and processed the landfill gas into saleable natural gas. The components of the plant had been previously used as a plant at a landfill in California before being moved to McCarty Road. There was conflicting testimony at trial regarding whether the components of the plant were owned by GSF or LFG Management Services, L.L.C.

On a daily basis, the plant takes in about 9 million cubic feet of landfill gas and produces about 4 million cubic feet of saleable natural gas. As part of the gas processing, the landfill gas is filtered through a pressurized tank filled with "iron sponge." The tank is about 15 feet tall. Iron sponge is made up of wood chips impregnated with iron oxide, and it removes hydrogen sulfide from the landfill gas. Over time, iron sponge becomes spent and no longer removes hydrogen sulfide from the gas passing through the tank. The iron sponge must then be replaced, generally two to three times per year. The iron sponge clumps together into hard pieces and sometimes adheres to the walls of the tanks. GSF has known since 1986 that iron sponge adheres to the walls of the tanks. The McCarty Road plant has two iron-sponge tanks, or vessels, which are known as V321A and V321B. The accident that killed Adan Padron occurred in V321B.

Beginning in 2001, GSF hired CES Environmental Services to periodically come to the plant to clean out the iron-sponge tanks. CES's employees would clean one of two tanks, while the other tank remained in operation. CES's employees cleaned the tanks by "hydroblasting" the inside of the tank with high-pressure water. They would climb on top of the tank and spray down into the tank through a "manway" that had been unbolted and removed. The hydroblasting breaks up the iron sponge, which is then vacuumed out through a hose.

On February 16, 2005, three CES employees, Adan Padron, Jose Ramirez, and Joe Carrillo, went to the McCarty Road plant to clean V321B. The last time that V321B had been cleaned was a year before. Carrillo received a "general and hazardous safety work permit" from James Jannise, who is an "operator" for GSF. Part of Jannise's job is to assist with filling the iron—sponge tanks. The purpose of the permit was to ensure that GSF had properly shut down the tank so the area would be safe to work in, and it was required to be issued as a part of GSF's work permit program. Michael Sawyer,

2. The appellees are Herlinda Padron, individually and as heir at law of Adan Padron, deceased, and as next friend of Adam Padron, Fernando Padron, Arturo Padron, and Hector Padron, minors; and Tayna Padron.

an independent process safety consultant, testified at trial that GSF's work permit indicated that only two of the four valves on the tank had been closed, which was improper.

Padron, Ramirez, and Carrillo spent four days hydroblasting the tank from the top. On February 21, Carrillo told Jannise that there was still some iron sponge they had not been able to remove through hydroblasting and that "we had to make tank entry" in order to remove the remainder. The next morning, Jannise told Carrillo that he had talked to Gary Valdez, the GSF McCarty Road plant manager, and that Valdez wanted the tank fully cleaned out. Valdez then came out to the tank and Carrillo told him that the hydroblasting was not working. At trial, Carrillo testified that Valdez never told him that the CES employees had to go inside the tank from the bottom, but he was impeached with his prior deposition testimony in which Carrillo said Valdez directed CES to carry out the work by having workers enter the tank. During his deposition, Carrillo stated he felt that he could not say "no" to Valdez. Valdez acknowledged he had a conversation with Carrillo about entering the tank to clean it, but Valdez did not testify that he told Carrillo to enter.

Carrillo testified that Valdez told him what tools and equipment they would need to work inside the tank. Carrillo said that Valdez told him to use nonsparking, brass tools so the CES workers would not create a spark that could accidentally ignite the combustible atmosphere inside the tank. Marlin Moser, a CES vice president, also told Carrillo to use brass tools. Because the CES workers were entering the tank, Valdez expanded the project by telling Carrillo to remove river rock and a broken screen from the bottom of the tank. Valdez then called CES's president, Matt Bowman, and discussed the need to enter the tank, and Bowman said he would send a "six-pack" of breathing air out to the plant.

GSF's work permit program required a "confined space safety work permit" to be issued before anyone entered the tank. Valdez testified that the CES workers could not enter the tank until he approved such a permit. Carrillo filled out a CES confined-space entry permit authorizing entry into the tank. The preprinted language of the permit stated, "Entry cannot be approved if any squares are marked in the 'No' column." Even though two boxes were checked "no," indicating the absence of required communications equipment and other safety equipment, Valdez nonetheless approved the permit.

Carrillo and Padron entered the tank and took turns using the pick to break the iron sponge into chunks, while the other person used a shovel to pile the debris into a pile to be vacuumed out. Carrillo testified that he had never before used a pick or shovel to clean iron sponge out of a tank and that the sponge in the tank was as "hard as a rock." Within 15 to 30 minutes of their entering the tank, a huge chunk of iron sponge fell, hit the ladder, and bounced off and hit Padron. Carrillo tried to lift the sponge, but it was too heavy.

After Carrillo was pulled from the tank, he called Moser, who went to the McCarty Road plant. Moser and Ramirez entered the tank and used an axe to break up the iron sponge that had fallen on Padron, who was then taken in an ambulance to the hospital. Padron was later pronounced dead, and an autopsy determined that the cause of death was blunt-force injuries to the head and neck.

Moser was asked for his explanation of why the iron sponge fell from the tank's roof. Moser testified without objection as to hearsay that Carrillo told him the following:

They—they—they were in there working, and had only been been in the tank—I don't know. Maybe 20 minutes or so, and they were having trouble getting it off because it didn't—it wasn't coming off for them easy, and there was a lot that was stuck to the walls to get off.

So they were getting kind of frustrated with what they were doing, so, you know—[Padron] was probably the best worker in the company. I mean, he was a—he was a work horse. He—he—he was—you know, he was—everybody wanted to work with him because he was the guy that got the job done all the time. Well, he—he took the brass pick, and he wound up—and he slammed it against the tank as hard as he could, and it stuck in the side of the tank, and—but it started knocking—the—the—the vibration started knocking stuff down, but—and I guess it kind of scared the hell out of Carrillo.

So [Padron], when he pulled it out of there—because he was shaking the tank pulling it out of there because he could barely get it off the wall. They were both in supplied air, and [Carrillo]—[Carrillo] was yelling to him "Don't—don't—don't do that again. Don't do that again." And he hauled off and hit it the second time, and when he hit it the second time, that's when the stuff just came loose from the top.

None of Carrillo's oral or written statements corroborates Moser's testimony.

Adan Padron's wife, Herlinda Padron, sued GSF, individually and as next friend for her four minor children Adam, Fernando, Arturo, and Hector Padron, for negligence and premises liability. Adan Padron's adult daughter, Tayna Padron, also filed a plea in intervention. The case was submitted to the jury based only on negligence. In its verdict, the jury found that

(1) GSF exercised or retained some control over the manner in which CES's work was performed, (2) GSF's and CES's negligence proximately caused Padron's death, (3) GSF's negligence was 60% and CES's negligence was 40%, (4) Herlinda's past pecuniary loss was $155,185, future pecuniary loss will be $858,044, past mental anguish and loss of companionship was $500,000, and future mental anguish and loss of companionship will be $1,500,000, (5) Adam Padron's past mental anguish and loss of companionship was $500,000 and future mental anguish and loss of companionship will be $1,000,000, (6) Fernando Padron's past mental anguish and loss of companionship was $500,000 and future mental anguish and loss of companionship will be $1,000,000, (7) Arturo Padron's past mental anguish and loss of companionship was $500,000 and future mental anguish and loss of companionship will be $1,000,000, (8) Hector Padron's past mental anguish and loss of companionship was $500,000 and future mental anguish and loss of companionship will be $1,000,000, and (9) Tayna Padron's past mental anguish and loss of companionship was $250,000 and future mental anguish and loss of companionship will be $500,000. The trial court rendered judgment on the verdict against GSF.

## Analysis

*Legal sufficiency*

In its first issue, GSF claims the evidence is legally insufficient to support the jury's finding that GSF exercised or retained some control over the manner in which CES's work was performed. Our review of the legal sufficiency of the evidence must consider the evidence in the light most favorable to the fact-finder's decision and indulge every reasonable inference in support of that decision. *See City of Keller v. Wilson*, 168 S.W.3d 802,

822 (Tex.2005). If the party attacking the legal sufficiency had the burden of proof on that issue, it must demonstrate that the evidence establishes all vital facts in support of that issue as a matter of law. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex.2001). As the reviewing court, we need first search the record for evidence that supports the finding and disregard all evidence to the contrary. *Id.* Absent evidence supportive of the finding, we then examine the entire record to determine if the contrary proposition was established as a matter of law and, if established conclusively, the issue must be sustained. *Id.* at 241–42.

▪ Generally, a general contractor does not have a duty to see that a subcontractor performs work in a safe manner. *Abarca v. Scott Morgan Residential, Inc.*, 305 S.W.3d 110, 126 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (citing *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex.1985)). However, a limited duty arises if a general contractor retains control over a subcontractor's methods of work or operative details to the point that the subcontractor is not entirely free to do the work in his own way. *Abarca*, 305 S.W.3d at 126 (citing *Koch Refining Co. v. Chapa*, 11 S.W.3d 153, 154 (Tex.1999)). The general contractor's "duty of reasonable care is commensurate with the control it retains" over the subcontractor. *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 355 (Tex.1998). General supervisory control that does not relate to the activity causing the injury is not sufficient to create a duty. *Abarca*, 305 S.W.3d at 126. However, "an employer who gives on-site orders or provides detailed instructions on the means or methods to carry out a work order owes the independent contractor employee a duty of reasonable care to protect him from work-related hazards." *Hoechst–Celanese*, 967 S.W.2d at 357.

▪ Control can be established in two ways: by (1) a contractual right of control or (2) an exercise of actual control. *Abarca*, 305 S.W.3d at 122 (citing *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002)). In this appeal, the only issue contested by all parties is that GSF exercised actual control. To be liable because it exercised actual control, GSF must have had the right to control the means, methods, or details of the independent contractor's work to the extent that the independent contractor was not entirely free to do the work his own way. *See Abarca*, 305 S.W.3d at 124 (citing *Ellwood Tex. Forge Corp. v. Jones*, 214 S.W.3d 693, 700 (Tex. App.-Houston [14th Dist.] 2007, pet. denied)). The control must relate to the injury the negligence causes. *Abarca*, 305 S.W.3d at 124. It is not enough that the owner has the right to order the work to stop and start or to inspect progress or receive reports. *Id.* Nor is it enough to recommend a safe manner for the independent contractor's employees to perform the work. *Id.*

Although there was conflicting evidence concerning whether GSF exercised actual control over the decision to enter the tank and remove the remaining iron sponge, there was evidence to support the jury's finding. Carrillo testified in his deposition, which was admitted at trial, that Valdez gave him directions on how to carry out the work by entering the tank and that he felt that he could not say "no" to Valdez. Carrillo testified that both Valdez and Moser told him to use nonsparking, brass tools. Valdez also expanded the project by telling Carrillo to remove river rock and a broken screen from the bottom of the tank. Valdez approved the confined-space entry permit that authorized entry into the tank. Valdez testified that the CES workers could not enter the tank until he approved such a permit, and he

acknowledged that he approved the permit notwithstanding the fact that the permit had two boxes checked "no" and the pre-printed language of the permit states, "Entry cannot be approved if any squares are marked in the 'No' column."

GSF argues that Valdez's approval of the confined-space entry permit is only some evidence that GSF did not follow its safety policies and that it is not evidence of GSF's control. As an example, GSF points to the Texas Supreme Court's opinion in *Lee Lewis Construction, Inc. v. Harrison,* in which the court held that evidence of a general contractor's inspection of the independent contractor's fall-protection equipment was some evidence that the general contractor retained a right to control. 70 S.W.3d 778, 784 (Tex. 2001). We disagree. Valdez's own testimony was that the CES workers could not enter the tank until he approved a permit and that he had specific discussions with CES workers about how to carry on once inside the tank.

GSF further argues that its actions do not relate to the injury-causing activity, which GSF identifies as Padron's alleged decision to "slam his pick axe a second time into the side of the tank." In doing so, GSF reads the duty of reasonable care that can arise to protect an independent contractor employee from work-related hazards too narrowly. *See Hoechst-Celanese,* 967 S.W.2d at 357. Here, Valdez suggested the tools used—nonsparking, brass pick axes—and approved entry to a 15–foot–tall tank that had iron sponge adhering to its walls. GSF was aware through its employee, Valdez, of what the CES workers would be doing inside the tank, i.e., using force to remove iron sponge. We hold that a reasonable jury could conclude that GSF retained control related to the injury-producing event.

Similarly, in its second issue GSF claims the evidence is legally insufficient to support the jury's finding that GSF's negligence proximately caused Padron's death. In a negligence action, a plaintiff must show that (1) the defendant owed a duty to the plaintiff, (2) the defendant breached that duty, and (3) the breach proximately caused the plaintiff's injuries. *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002). Proximate cause requires proof of both cause in fact and foreseeability. *W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred.[3] *Id.* (citing *Marathon Corp. v. Pitzner,* 106 S.W.3d 724, 727 (Tex.2003)).

GSF again argues that its actions do not relate to the injury-causing activity, which GSF generally identifies as CES's work in cleaning out the tank and specifically identifies as Padron's alleged decision to slam his pick axe twice into the side of the tank. In its brief, GSF sums up its argument by stating, "By merely allowing Carrillo and Padron to enter the vessel and complete their job, GSF Energy did not cause the accident." The jury, however, in its answer to question 1 found that GSF exercised or retained control over the manner in which CES's work was performed, and there is more than a mere scintilla of evidence to support this finding. Consequently, we do not agree that the evidence supports a characterization that GSF "merely" allowed Carrillo and Padron to enter the vessel and complete their job. Rather, the record demonstrates that GSF not only permitted entry into the tank from the bottom, but was aware of the dangers of removing sponge and, through

---

**3.** GSF does not argue the foreseeability element of proximate cause in issue two.

its employee Valdez, approved nonsparking brass pick axes to remove the sponge from the confined interior of the tank. GSF does not dispute that the accident was caused by the use of a pick axe inside the tank. Accordingly, we conclude there is more than a mere scintilla of evidence to support the jury's finding that GSF's negligence proximately caused Padron's death.

We overrule the first and second issues concerning legal insufficiency of the evidence.

*Charge error*

■ In its fifth issue, GSF contends the trial court erred in refusing to submit questions in the charge on Padron's negligence. GSF argues, and we agree, that the following testimony raises the question of Padron's negligence:

> Well, he—he took the brass pick, and he wound up—and he slammed it against the tank as hard as he could, and it stuck in the side of the tank, and—but it started knocking—the—the—the vibration started knocking stuff down, but—and I guess it kind of scared the hell out of Carrillo.

> So [Padron], when he pulled it out of there—because he was shaking the tank pulling it out of there because he could barely get it off the wall. They were both in supplied air, and [Carrillo]— [Carrillo] was yelling to him "Don't—

don't—don't do that again. Don't do that again." And he hauled off and hit it the second time, and when he hit it the second time, that's when the stuff just came loose from the top.

A trial court may refuse to submit a question only if no evidence exists to warrant its submission. *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex.1992); Tex.R. Civ. P. 278. GSF requested, and the trial court refused, a contributory-negligence issue.

Appellees contend that the trial court properly refused to submit questions in the charge on Padron's negligence because there was no expert testimony submitted requiring Padron's alleged negligence. We disagree. The evidence that supports the submission of the questions is that when Padron first struck the iron sponge on the tank, the vibration "started knocking stuff down." Under those circumstances, it would be within the "common knowledge of laymen" that hitting the iron sponge again might cause further portions of the sponge to fall. *See FFE Transp. Servs. v. Fulgham*, 154 S.W.3d 84, 89–90 (Tex.2004).[4]

■ We sustain GSF's fifth issue. Because reversal based on an improper submission of the charge requires a remand for new trial, we do not reach the remaining issues, none of which entitles GSF to rendition.[5]

---

4. On rehearing, Herlinda Padron contends that GSF did not raise an argument at the charge conference that a comparative-responsibility issue should be submitted based on Moser's unobjected-to hearsay testimony concerning Carrillo's statement to Padron. *See* Tex.R. Evid. 802 ("Inadmissible hearsay admitted without objection shall not be denied probative value merely because it is hearsay."). Instead, Herlinda Padron contends that the only evidence GSF raised was that Padron did not use a light to inspect the vessel. This is incorrect. This argument was raised below. Moser was the last witness to testify at trial, and the trial court referred to

Moser's testimony during the charge conference when asked to submit a comparative-responsibility issue: "I get the point. I— where I'm trying to remember is—*I remember the comment at the end,* but outside of that, where is the rest that even broaches the subject of Padron having something to do with this?" (Emphasis added).

5. These issues are: the trial court erred in refusing to submit an instruction in the charges concerning Civil Practice and Remedies Code chapter 95 (issue 3); the evidence is factually insufficient to support the jury's findings concerning control and proximate

## Conclusion

The judgment of the trial court is reversed, and the case is remanded for further proceedings.

cause (issue 4); the evidence is factually insufficient to support the jury's findings concerning loss-of-companionship and mental-anguish damages (issue 6); and the trial court erred in holding GSF jointly and severally liable. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 95.001–.004 (West 2005). GSF states in its appellate brief that the remedy for the trial court's refusal to submit a chapter 95 instruction is for this Court to render a take-nothing judgment. We are not aware of any authority that would allow an appellate court to render judgment based solely on the trial court's error in submitting an incorrect charge.