**Opinion filed May 31, 2018**



In The

# Eleventh Court of Appeals

_____

## No. 11-16-00139-CV

_____

## DIANA GODINES, INDIVIDUALLY AND ON BEHALF OF AMANDO GODINES, SR., DECEASED; MICHAEL GODINES; AMANDO GODINES, JR.; AND DEANNA QUITUGUA, Appellants

## V.

## PARSLEY ENERGY OPERATIONS, LLC, Appellee

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. 52258**

## M E M O R A N D U M   O P I N I O N

Amando Godines, Sr., an employee of Precision Drilling Company, L.P., died in an accident at a Parsley Energy Operations, LLC's well site named "Hall 11-4." After Godines's death, his wife, Diana Godines, individually and on behalf of her

husband, and Godines's biological children (collectively Appellants) brought suit against Parsley for negligence and gross negligence.

Parsley answered and filed a hybrid no-evidence and traditional motion for summary judgment. On no-evidence grounds, Parsley asserted that no evidence existed that it owed any legal duty to Godines and that Appellants could not establish the subjective and objective elements of gross negligence. On traditional grounds, Parsley asserted that it owed no legal duty to Godines and that, as a "property owner," Parsley was immune from liability pursuant to Chapter 95 of the Civil Practice and Remedies Code.[1]

The trial court granted Parsley's motion on both no-evidence and traditional grounds. Appellants appeal the trial court's grant of summary judgment in Parsley's favor. We affirm.

## I. *Summary Judgment Evidence*

At the time of the incident, Parsley owned the mineral interest at Hall 11-4. In order to produce the minerals, Parsley contracted with Precision under an "International Association of Drilling Contractors Drilling Bid Proposal and Daywork Drilling Contract" to be its drilling contractor. The drilling contract required Precision to initially drill at Parsley's other well site, "JRS Farms 24A-3," and to furnish the rig for drilling—Rig 305. Eventually, Precision was directed to begin drilling at Hall 11-4. It was necessary for Rig 305 to be transported from the previous well site to Hall 11-4, and based on the drilling contract, Parsley assumed the responsibility of transportation of Rig 305.

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 95.002–.003 (West 2011).

Parsley contracted with J.W. Mulloy to serve as the "company man."[2] Mulloy assigned Freddie Pontremoli to be one of the company man representatives. Pontremoli described his duties as:

> Well, I -- drill the wells. I tell the people on the -- on the rig how to drill these wells. Like -- per se like how much weight to run on the bit, how many RPM to turn the rotary table and how far we drill for each section to surface, intermediate and production stream. That's my job.

Pontremoli also "agreed" to the following deposition questions:

> Q: Okay. As a consultant for Parsley, what -- it would be your duty and responsibility to make sure that locations are set up properly so you can get the rig set up, start drilling, get the drilling completed and then move on to the next site and just re-create that process from drill hole to drill hole to drill hole.
>
> Q: Okay. And as the consultant, you would have to make sure that all those different contractors that are out there providing services to Parsley, that they move in concert and act in concert to get the drills completed and move on to the next well to drill?

Parsley contracted with Briley Trucking Company to fulfill that obligation. Briley provided "[a]ll equipment, materials and supplies" for the rig move. Precision, per

---

[2] A company man is a term of common use in the oil and gas industry. *Melvin Green, Inc. v. Questor Drilling Corp.*, 946 S.W.2d 907, 908 n.3 (Tex. App.—Amarillo 1997, no pet.). "[T]he term 'company man' does not refer definitively to either an employee or an independent contractor." *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 90 (Tex. App.—Houston [1st Dist.] 2003, no pet.). The Houston Court of Appeals referred to a "company man" as:

> The representative of the oil company or operator on a drilling location. For land operations, the company man is responsible for operational issues on the location, including the safety and efficiency of the project. Even administrative managers are expected to respond to the direction of the company man when they are on the rig site.

*Expro Americas, LLC v. Sanguine Gas Exploration, LLC*, 351 S.W.3d 915, 918 n.1 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (citing Schlumberger Oilfield Glossary: *Company Man*, SCHLUMBERGER, http://www.glossary.oilfield.slb.com/en/Terms/c/company_man.aspx, (last visited Apr. 24, 2018).

the drilling contract, was required to help Briley with the "move in" and "move out" process, including "rig up" once the rig was transported to the well site.

Rig 305 consists, in part, of a three-part telescoping mast. Briley transported the mast to the Hall 11-4 using the "two trucking" method. Under that method, the three parts of the mast were partially nested together and laid down horizontally on two trailers, each of which was connected to a semi-tractor. The crown section of the mast was nested inside the middle section, and the weight of the crown rested on a fifth wheel that was located on one of the trucks. Pins were used to hold the crown and middle section in place during transportation. The driver of one of the trucks drove in reverse, and the other drove forward; in this manner, they delivered the mast to the new well site.

A Briley employee, the "truck pusher," suggested the two-trucking method. Roger Dean Moran, Precision's rig superintendent, was in Alice, Texas, at the time but approved the two-trucking method by phone. Parsley's drilling superintendents, Joey Sims and David Brandenburg, made no recommendations or determinations on how Rig 305 should be transported and did not supervise transportation or assembly of the rig.

The mast was safely transported to the Hall 11-4. Once it was there, Briley and Precision worked to set up the other components of Rig 305, particularly the substructure where the mast would be placed, with the ultimate goal of removing the mast from the tractor-trailers.

At some point, the Briley truck pusher received a call on his radio[3] asking whether they were "ready to . . . open up the derrick." The Briley truck pusher

---

[3] Only Briley truck pushers used the radios.

4

subsequently walked toward the mast and picked up a sledgehammer. Godines, who was nearby, then had a conversation with the truck pusher.[4] After this conversation, Godines crawled underneath the mast and subsequently removed one of the pins from the mast with a sledgehammer. Normally, in this part of the operation, pole trucks or a crane are used to provide support for the mast while the pins are removed; here, no crane or pole truck was used to support the mast. When the one pin was removed, the pin on the opposite side of the mast fractured and a section of the mast shifted and fell. Godines was pinned between the fifth wheel on one of the trucks and the section that fell. Godines died as a result of the injuries that he suffered in the accident.

Pontremoli was the only "representative" of Parsley on site when Godines was fatally injured. He arrived about thirty minutes before the accident occurred and went to his trailer on site. At the time of the accident, Pontremoli was still in his trailer. Pontremoli did not know who gave the instruction to remove the mast pin.

## II. *Issues Presented*

On appeal, Appellants raise eight issues. Appellant's first issue is a global issue related to the summary judgment. In the next four issues, Appellants contest the application of Chapter 95. Appellants argue in their second issue that the trial court erred when it applied Chapter 95. They assert in their third, fourth, and fifth issues that, even if Chapter 95 applies, there is a genuine issue of material fact that pertains to the exception under Section 95.003 relating to Parsley's control and

---

[4] The summary judgment evidence is in dispute as to whether the Briley truck pusher gave Godines the sledgehammer and instructed him to knock out the pins or whether Godines grabbed the sledgehammer from the truck pusher and knocked out the pins on his own accord. We "take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

actual knowledge, respectively. In their sixth and seventh issues, Appellants allege that there is evidence that raises a genuine issue of material fact on whether Parsley owed Godines a legal duty. In Appellants' eighth issue, they claim there is evidence that raises a genuine issue of material fact on their gross negligence claim.

### III. *Standards of Review*

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). A trial court must grant a no-evidence motion for summary judgment unless the nonmovant produces more than a scintilla of probative evidence to raise a genuine issue of material fact. TEX. R. CIV. P. 166a(i); *Wal–Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002). A no-evidence motion for summary judgment is essentially a pretrial directed verdict, and we apply the same legal sufficiency standard in reviewing a no-evidence summary judgment as we apply in reviewing a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). We review the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence and inferences. *Id.* A defendant who moves for traditional summary judgment must either negate at least one essential element of the nonmovant's cause of action or prove all essential elements of an affirmative defense. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). Once the defendant establishes a right to summary judgment as a matter of law, the burden shifts to the plaintiffs to present evidence raising a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979). To determine if a fact question exists, we must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all the evidence presented. *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 755 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005). If

6

differing inferences may reasonably be drawn from the summary judgment evidence, a summary judgment should not be granted. *Nixon v. Mr. Property Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985).

IV. *Analysis*

We first address issue two: whether Chapter 95 applies in this case. Because we conclude it does not, we outline the threshold inquiry of duty and then address issues six, seven, and eight: whether the summary judgment evidence shows that Parsley owed a duty to Godines and whether the Godines family produced more than a scintilla of evidence that Parsley was grossly negligent.

> A. *Issue Two: Chapter 95 does not apply because Godines' death did not arise from a condition or use of an improvement to real property.*

Appellants argue that Chapter 95 does not apply in this case because Parsley failed to establish that Godines' death arose from a condition or use of an improvement to real property. We agree. Parsley had the burden to prove Section 95's applicability. *Lopez v. Ensign U.S. Southern Drilling, LLC*, 524 S.W.3d 386, 842 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Section 95.002 states that Chapter 95 only applies to claims against a "property owner" for a death "that arises from the condition or use of an improvement to real property, where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement." TEX. CIV. PRAC. & REM. CODE § 95.002. We note that Parsley as the owner of the mineral interest at Hall 11-4 established that it was a "property owner" within the meaning of Section 95.002. *See Lopez*, 524 S.W.3d at 843. However, Parsley failed to establish that Godines' death arose "from a condition or use of the same improvement on which the contractor (or its employee) is working when the injury

7

occurs." *Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 567 (Tex. 2016); *see Lopez*, 524 S.W.3d at 845. Because Chapter 95 does not apply in this case, Parsley could not prevail on summary judgment on this ground.

### B. The Threshold Inquiry on Duty

The threshold inquiry in a negligence case "is whether the defendant owes a legal duty to the plaintiff." *Boerjan v. Rodriguez*, 436 S.W.3d 307, 310 (Tex. 2014) (citing *Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995)). Appellants contend that "Parsley owed Mr. Godines a duty to exercise reasonable care to establish and maintain a workplace free of recognized hazards and provide overall safety leadership for contractors on its worksite, including monitoring the performance of those it hired . . . and to prevent open and obvious dangers." Appellants further argue that this duty arises from Parsley's retention and control over work operations and its contractors at the well site. Parsley, in contrast, argues that it had no duty to supervise the activities of its contractors to ensure that they acted in a nonnegligent manner. In this case, we must determine whether Parsley, a premises owner and a general contractor,[5] owes one of its independent contractor's employees a legal duty and, if so, the extent of that duty. In general, "the duties owed by premises owners and general contractors to employees of an independent contractor are the same." *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 291–92 (Tex. 2004) (citing *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 n.1 (Tex. 1999)); *see Clayton W. Williams*, *Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex. 1997).

In general, "a premises owner does not have a duty to ensure that an independent contractor safely performs his work." *Koch*, 11 S.W.3d at 155 (citing

---

[5] Parsley owns the mineral interest at Hall 11-4 and was Precision's general contractor.

*Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)). However, a premises owner or general contractor may incur a duty if it retains "some control over the manner in which the independent contractor's work is performed." *Hoechst–Celanese Corp. v. Mendez*, 967 S.W.2d 354, 356 (Tex. 1998) (quoting *Redinger*, 689 S.W.2d at 418). Texas has adopted Section 414 of the *Restatement (Second) of Torts*, which contains this provision:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1965); *see Redinger*, 689 S.W.2d at 418 (adopting Section 414). This means that "[w]hen the premises owner retains some control over the independent contractor's work, it must exercise that control with reasonable care." *Koch*, 11 S.W.3d at 155. To assume that duty, however, the control must be over the methods or the operative details of the independent contractor's work, and "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Mendez*, 967 S.W.2d at 356 (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmts. a, c).

> C. *Issues Six and Seven: Because Parsley did not retain contractual or actual control over the workplace operations or workplace safety, it owed no duty to Godines.*

Appellants argue that Parsley owed a duty because Parsley retained control over work operations and its contractors at the well site. Parsley, in contrast, argues that it had no duty to supervise the activities of its contractors to ensure that they acted in a nonnegligent manner.

9

*1. Appellants have failed to adduce evidence that raised a question of material fact that Parlsey exercised or retained contractual or actual control over the injury-producing activity.*

There must be a "nexus between an employer's retained supervisory control and the condition or activity that caused the injury." *Id.* at 357; *Elliott-Williams Co. v. Diaz*, 9 S.W.3d 801, 804 (Tex. 1999). In this case, Godines died when he removed one of the pins on the mast. Thus, the injury-producing activity in this case was assembly of the rig. Appellants maintain, however, that the use of the two-trucking method created the condition on Parsley's property—an unsupported mast suspended between two trucks—that proximately caused Godines's death. Evidence in the record indicates that, absent the two-trucking method, Godines would not have needed to remove the pins from the mast; therefore, in our assessment of Parsley's control, we also consider whether Parsley exercised control over the method or operative details of transportation of the rig. *See Joeris General Contractors, Ltd. v. Cumpian*, 531 S.W.3d 187, 200 (Tex. App.—San Antonio 2016, pet. filed) (indicating that case law "require[s] that the general contractor's control directly affect, cause, or relate to the complained-of injuries" (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001); *Hagins v. E–Z Mart*, 128 S.W.3d 383, 390–91 (Tex. App.—Texarkana 2004, no pet.))).

The issue then becomes whether Parsley exercised control over the method or operative details of transportation or assembly of the rig. Control may be proven in two ways: (1) "by evidence of a contractual agreement that explicitly assigns the premises owner a right to control" and (2) "by evidence that the premises owner actually exercised control over the manner in which the independent contractor's work was performed." *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002).

## 2. *Contractual control is lacking.*

Appellants point to various provisions in the drilling contract between Precision and Parsley to show that Parsley exercised the requisite control to owe Godines a duty. Determining whether a contract vests control is a question of law. *Id.*; *see Elliott-Williams*, 9 S.W.3d at 804 ("Contract construction is a matter of law for the trial court."). We conclude as a matter of law that the drilling contract does not vest Parlsey with the requisite control to owe Godines a legal duty.

Appellants point out that Parsley contractually retained "the right to designate the points at which casing will be set and the manner of selling, cementing, and testing." Next, they rely on provisions that show Parsley was required "to maintain the road and location in such a condition that will allow free access and movement to and from the drilling site," to "prepare a sound location adequate in size and capable of properly supporting the drilling rig," and to be "responsible for a casing and cementing program adequate to prevent soil and subsoil wash out." To the extent that these provisions vest Parsley with control over Precision,[6] this control is unrelated to the injury-producing condition or activity in this case. *See Mendez*, 967 S.W.2d at 357 (requiring a nexus between the supervisory control and the condition or activity that caused the injury). These provisions do not indicate that Parsley contractually retained the right to control the method or operative details of transportation or assembly of the rig.

---

[6] *See Painter v. Sandridge Energy, Inc.*, 511 S.W.3d 713, 721–22 (Tex. App.—El Paso 2015, pet. denied).

11

Appellants further point to the drilling contract to evidence Parsley's control. They argue that the following provision shows Parsley's contractual control: "Except for such obligations and liabilities specifically assumed by [Precision Drilling], [Parsley] shall be solely responsible and assumes liability for all consequences of operations by both parties on a Daywork Basis, including results and all other risks or liabilities incurred in or incident to such operations." We disagree with Appellants' interpretation. This provision apportions obligations and liability between Precision and Parsley; it does not give Parsley a right to control the method or operative details of transportation or assembly of the rig. We decline to hold that this provision imposes a legal duty on Parsley. *Cf. Elliot-Williams*, 9 S.W.3d at 804–05 (construing a financial responsibility provision as not vesting control over the means, methods, or operative details of a contractor's work).

Appellants also place emphasis on the fact that Parsley assumed the responsibility to furnish specific equipment, materials, and services relevant to work performed on the drilling site. Appellants, however, do not specify which equipment, materials, or services Parsley contractually agreed to furnish to show that Parsley retained the requisite control to create a legal duty. This court's review of the agreement reveals that Parsley assumed the responsibility to provide various pieces of equipment and services, most of which relate to drilling. For transportation, Parsley was required to provide for and bear the cost of transporting Rig 305, and Precision was required to assist in transportation by arranging for the trucks and cranes. Although Parsley assumed the obligation of transporting the rig, Parsley contracted with Briley under a Master Service Agreement (MSA) to fulfill that obligation. Appellants presented no evidence that Parsley controlled the method or operative details of Briley's work. Specifically, Appellants presented no evidence

that Parsley instructed Briley to use the two-trucking method or to begin removing the pins from the mast.

### 3. Contractual control over safety responsibilities also is lacking.

Appellants argue that, because Parsley assumed safety responsibilities in the drilling contract, Parsley owed a duty to Godines. A premises owner who imposes safety requirements on its independent contractors owes a "*narrow* duty of care." *Mendez*, 967 S.W.2d at 357. The premises owner owes a duty that any safety requirements and procedures that are promulgated do not "unreasonably increase, rather than decrease, the probability and severity of injury." *Id.* at 358. The drilling contract states that "Operator agrees to comply with all Contractor's safety requirements." "Operator" under the agreement is Parsley, and "Contractor" is Precision. Contrary to Appellants' interpretation, Parsley contractually agreed to comply with Precision's safety requirements; accordingly, Parsley did not assume a limited duty based on this provision. Appellants also point out that Parsley contractually retained the right to pay safety bonuses to Precision's employees. However, based on the Texas Supreme Court's opinion in *Bright*, such a provision does not create a legal duty. *See Bright*, 89 S.W.3d at 609 (no duty imposed on premises owner where premises owner "had a Safety Incentive Program that rewarded contractors who had achieved certain safety milestones"). Having reviewed the evidence in the light most favorable to Appellants, we conclude, as a matter of law, that Parsley did not retain the degree of contractual control necessary to create a duty. We now address the next issue of whether Parsley asserted actual control over the injury-producing condition or activity.

*4. Appellants assert that the testimony of Sims, Pontremoli, and Eduardo Quezado raised questions of material fact on Parsley's actual control.*

Appellants assert that Parsley exercised actual control over the direction and management of work on the drilling site and its contractors. Appellants point to Sims's, Pontremoli's, and Quezado's deposition testimony as evidence of questions of material fact on Parlsey's actual control. Appellants assert that Sims, Parsley's drilling superintendent, exerted actual control. Appellants argue that Parsley supervised and asserted control because Pontremoli was Parsley's company man. Appellants argue that Quezado, a Precision employee, exercised actual control, through Pontremoli, by rushing Precision and Briley to conduct rigging-up operations. In Sims's, Pontremoli's and Quezado's situations, the summary judgment evidence, as we explain below, fails to raise a requisite question of material fact on actual control over the injury-producing condition or activity.

Sims testified by deposition (made a part of the summary judgment evidence) that Parsley retained ultimate authority over Hall 11-4 and its contractors. For example, Sims answered "yes" to the following deposition questions: Parsley "exercised ultimate authority over the job site, right?"; "You agree Parsley Energy is responsible to direct and manage . . . the service companies that it hires?"; and Parsley "routinely did that on this job site, exercised its ultimate authority?" While this summary judgment evidence does indicate that Parsley retained broad authority over Hall 11-4 and its contractors, "[e]very premises owner must have some latitude to tell its independent contractors what to do, in general terms and may do so without becoming subject to liability." *Koch*, 11 S.W.3d at 156 (citing *Redinger*, 689 S.W.2d at 418). Sims further testified in his deposition that Brandenburg, a Parsley drilling

14

superintendent, had the authority to stop dangerous activity taking place on the well site and also had the authority to direct Pontremoli on how to stop or prevent the dangerous activity in the future. "While a duty may arise if an employer retains the power to forbid employees of its independent contractor from performing work in a dangerous manner, that duty does not arise unless the employer retains the right to control the independent contractor as to the methods or operative details of the work." *Howarton v. Minnesota Mining & Mfg., Inc.*, 133 S.W.3d 820, 825 (Tex. App.—Eastland 2004, no pet.).

Appellants do not contest that Pontremoli was an independent contractor or that Parsley did not directly communicate with and supervise Pontremoli through Parsley's drilling superintendent, Brandenburg. Pontremoli was an independent contractor for Parsley, who had originally contracted with Mulloy to serve as its company man under the terms of an MSA; Mulloy, in turn, assigned Pontremoli to Parsley. Pontremoli was paid by Mulloy, and Parsley paid Mulloy for Pontremoli's services. Parsley and Pontremoli had no direct contract, and according to Pontremoli's testimony, he operated under an oral employment agreement with Mulloy.

Parsley delegated to Pontremoli authority over the well site and over Parsley's other contractors. Specifically, Parsley delegated to Pontremoli the authority to (1) stop a contractor trucking company's activities if it was doing something contrary to Parsley's expectations; (2) pick contractors for rig transportation; (3) ensure safety checks were being conducted by Precision before drilling commenced; (4) ensure rigging-up operations were done in a safe manner consistent with all laws and regulations; and (5) direct and control the activities of the contractors on the well

15

site. But to show Parsley was acting through Pontremoli,[7] Appellants rely on summary judgment evidence that Parsley delegated authority to Pontremoli over the well site and over Parsley's other contractors. From this delegation of authority, Appellants assert that Parsley assumed a duty to Godines to provide a safe workplace under Section 414 of the *Restatement (Second) of Torts*. None of this delegated authority, however, shows that Parsley controlled the method or operative details of the injury-producing condition or activity.

Even though Parsley gave Pontremoli the power to stop and start Briley's work, "stop and start" authority does not trigger the rule of liability under Section 414 of the *Restatement (Second) of Torts*. *See* RESTATEMENT (SECOND) OF TORTS § 414 cmt. c. In addition, even though Pontremoli had the authority to hire contractors for rig transportation—and did in fact arrange for Briley to move Rig 305—that does not mean that Briley was not free to transport the rig in any way that it saw fit.[8] *See id.* No evidence was adduced that Pontremoli instructed Briley to use the two-trucking method. And, even though Parsley required Pontremoli to ensure safety checks were being conducted, this is no evidence that Parsley exercised control. *See Bright*, 89 S.W.3d at 608 (no actual exercise of control even though the general contractor required its safety representative to conduct a pre-job safety conference and on-site inspection with the contractor before allowing work to commence); *see also Koch*, 11 S.W.3d at 155–57.

---

[7] Appellants do not allege that Parsley is vicariously liable for Pontremoli's actions—if any that would give rise to liability—under an agency theory.

[8] A part of the summary judgment record shows that Pontremoli testified in his deposition that he arranged for the rig to be moved but that he did not tell "Precision how to move their rig or tell Briley how to."

Furthermore, the fact that Parsley required its company man to ensure that rigging-up operations were done safely and in compliance with all laws is also not evidence of actual control by Parsley. *See Koch*, 11 S.W.3d at 156 (testimony that suggested the premises owner would make sure its independent contractor's work was being done in a safe manner was not evidence of actual control by the premises owner); *see also Bright*, 89 S.W.3d at 607. Moreover, the fact that Parsley expected its company man to direct its contractors is not evidence that any direction or orders were *actually* given to Precision or Briley on the day of the rig move. This only shows that Pontremoli *could* have ordered Precision or Briley to do something. *See Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) ("A possibility of control is not evidence of a 'right to control' actually retained or exercised."). None of Appellants' summary judgment evidence raises a question of material fact that Pontremoli exercised the control vested in him on the day of the accident. Appellants did not produce evidence that Pontremoli approved of the two-trucking method or instructed Precision or Briley to transport the rig using the two-trucking method. Appellants also did not produce evidence that Pontremoli instructed Briley or Precision to begin removing the mast from the semi-tractors.

Finally, Appellants argue that Parsley's company man, Pontremoli, exercised actual control by rushing Precision and Briley to conduct rigging-up operations. Quezado testified that Pontremoli "was rushing all of us" and the "truck drivers" on the day of the accident. When asked how the company man was rushing them, Quezado stated that "[i]t wasn't directly to us" but that "he would just come out and say[,] I need you to do this or do that," and "he said it loud enough where we could all hear him."

17

But this testimony does not show that Pontremoli gave specific instructions or orders to Precision and Briley about assembling the rig or removing the pins from the mast. *See Painter v. Momentum Energy Corp.*, 271 S.W.3d 388, 406–07 (Tex. App.—El Paso 2008, pet. denied) (on-site consulting company did no assert actual control over the injury-producing activity through independent-contractor company man because company man did not give "any instruction over the operative details of laying down of the blowout preventer and the rotating head"); *cf. Lee Lewis Constr.*, 70 S.W.3d at 784; *GSF Energy, LLC v. Padron*, 355 S.W.3d 700, 706–08 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *Pena v. TXO Prod. Corp.*, 828 S.W.2d 188, 190–91 (Tex. App.—Corpus Christi 1992, no writ). "Every premises owner must have some latitude to tell its independent contractors what to do, in general terms, and may do so without becoming subject to liability." *Koch*, 11 S.W.3d at 156.

Appellants do not direct this court to any instances where Parsley actually exercised its broad authority over the well site and its contractors. Specifically, they provide no evidence that Parsley instructed Briley or Precision to use the two-trucking method or directed Briley or Precision employees to begin removing the pins from the derrick. Having reviewed the evidence in the light most favorable to the Godines family, we conclude that Parsley established as a matter of law that it owed no duty to Godines and that the Godines family failed to bring forth more than a scintilla of evidence that raised a question of material fact that Parsley actually asserted control over the injury-producing condition or activity.

*5. Appellants' expert testimony does not raise a question of material fact on duty.*

Appellants rely on their oil field and workplace safety experts to show Parsley's legal duty. Appellants argue that their first expert, John P. Hughett, shows that Parsley's legal duty to provide a safe workplace arises from custom in the oil and gas industry. Next, Appellants rely on their second expert, Gary S. Nelson, to argue that OSHA standards establish Parsley's legal duty to Godines. Parsley argues that Appellants "cannot offer expert testimony to meet their burden of establishing that Parsley had a legal duty." We agree with Parsley. Determining whether there is a legal duty is not based on what is customary for operators in the oil and gas industry or on OSHA standards; it is based on the amount of actual or contractual control asserted by the premises owner or general contractor over the independent contractor. *See Redinger*, 689 S.W.2d at 418; *see also Richard v. Cornerstone Constructors, Inc.*, 921 S.W.2d 465, 468 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (OSHA regulations do not expand a state's common law duties (citing 29 U.S.C.A. § 653(b)(4)).

As we explained above, Parsley did not assert contractual or actual control over transportation or assembly of the rig—the injury-producing condition or activity in this case. Therefore, Parsley incurred no duty to Godines as a matter of law. Because we have concluded as a matter of law that Parsley incurred no duty, "expert testimony is insufficient to create a duty where none exists at law." *Nat'l Conven. Stores Inc. v. Matherne*, 987 S.W.2d 145, 148–49 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (citing *J & C Drilling Co. v. Salaiz*, 866 S.W.2d 632, 639 (Tex. App.—San Antonio 1993, no writ)). "[A]n expert is not competent to give an opinion or state a legal conclusion regarding a question of law because such question

19

is exclusively for the court to decide and is not an ultimate issue for the trier of fact." *Id.* (citing *Dickerson v. DeBarbieris*, 964 S.W.2d 680, 690 (Tex. App.—Houston [14th Dist.] 1998, no writ)); *see Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998) (determining whether there is a legal duty is a question of law). Appellants' experts provide no evidence that shows Parsley, through its employees or company man, instructed Briley or Precision to transport the rig using the two-trucking method or to begin removing the pins from the mast. Therefore, we decline to hold that Hughett's and Nelson's affidavits create a genuine issue of fact as to Parsley's legal duty, and accordingly, we overrule issues six and seven.

D. *Issue Eight: Because Parsley owed no legal duty to Godines, Appellants cannot establish gross negligence.*

In their eighth issue, Appellants allege that the evidence that they adduced raises a genuine issue of fact that Parsley was grossly negligent. Parsley argues that Appellants' claim of gross negligence fails because they cannot show that Parsley owed a legal duty. Gross negligence is comprised of two elements—one objective and one subjective. *Turner v. Franklin*, 325 S.W.3d 771, 781 (Tex. App.—Dallas 2010, pet. denied) (citing *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 22–23 (Tex. 1994)).

Appellants had the burden to produce more than a scintilla of evidence of the objective and subjective elements of gross negligence to defeat Parsley's no-evidence motion for summary judgment. A party cannot, however, establish that an actor was grossly negligent in the absence of proving the actor was negligent under the ordinary standard. *Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 174 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (citing *Trevino v. Lightning Laydown, Inc.*, 782 S.W.2d 946, 949 (Tex. App.—Austin 1990, writ denied)); *see*

*Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993) (reiterating "that grossly negligent conduct must impose an objectively higher risk than ordinary negligence" (citing *Williams v. Steves Indus., Inc.*, 699 S.W.2d 570, 573 (Tex. 1985))). Appellants failed to present more than a scintilla of evidence that Parsley owed Godines a legal duty and, thus, failed to carry their burden of producing more than a scintilla of evidence that Parsley was grossly negligent. Accordingly, we do not address Appellants' gross negligence cause of action in further detail. *See Salazar v. Ramos*, 361 S.W.3d 739, 748 (Tex. App.—El Paso 2012, pet. denied); *Wortham v. Dow Chemical Co.*, 179 S.W.3d 189, 201 n.16 (Tex. App.—Houston [14th Dist.] 2005, no pet.). We overrule issue eight. In light of this court's disposition of the second, sixth, seventh, and eighth issues, we also overrule Appellants' global first issue.

## V. *Conclusion*

The trial court did not err when it granted summary judgment in favor of Parsley.

## VI. *This Court's Ruling*

We affirm the judgment of the trial court.


                                                MIKE WILLSON

May 31, 2018                                    JUSTICE

Panel consists of: Willson, J.,
Bailey, J., and Wright, S.C.J.[9]

---

[9] Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.